Phyllis WILLIAMS, Appellant,

v.

DeJeaux WILLIAMS, Appellee.

No. S–13527.

Supreme Court of Alaska.

May 27, 2011.

Phyllis Williams, pro se, Anchorage, Appellant.

DeJeaux Williams, pro se, El Paso, Texas, Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

1. 10 U.S.C. § 1408.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

A divorced mother appeals the superior court's denial of four motions to reconsider child support, visitation arrangements, appointment of a court custody investigator, and her share of her ex-husband's military retirement pay. We affirm the superior court's decision on each issue except for visitation, which we decline to reach on mootness grounds. We also reject the mother's claim that the superior court judge handling the case exhibited bias against her.

## II. FACTS AND PROCEEDINGS

After 14 years of marriage, Phyllis and DeJeaux Williams divorced in 2000. They have one child, Camerin, born November 23, 1995. Phyllis and Camerin live in Alaska and DeJeaux lives in Texas. The relationship between the parties is contentious, and the past ten years have seen near-constant litigation on the issues of child support, visitation, custody, and property division. Phyllis raises similar types of issues in her appeal to this court. Both she and DeJeaux are pro se.

### A. Military Retirement

DeJeaux was in the military during the parties' entire 14–year marriage. However, the property settlement provisions of the parties' original divorce decree, issued in December 2000, did not specifically address DeJeaux's future military retirement pay. In July 2001, the superior court amended the decree to hold that upon DeJeaux's retirement, Phyllis was entitled to "one half (½) times 170 months of married military service divided by the total number of months defendant eventually serves in the military." It appears DeJeaux retired sometime in 2006. In June 2007, citing the Uniformed Services Former Spouses' Protection Act [1] (USFSPA), the court awarded Phyllis 35% of DeJeaux's retirement pay. The court explained how it reached this percentage as follows: "50% ×

(months of military service during marriage) ÷ (total months of active service)[,] more fully defined as: 50% × 168 months ÷ 240 months = 35%."

In January 2009, citing generally to the USFSPA, Phyllis asked the superior court to increase her entitlement to DeJeaux's military retirement pay from one-third to 50%. The court denied Phyllis's request, explaining that the 35% determination was properly "based upon the number of years the parties were married and the number of years DeJeaux was in the military."

On April 3, 2009, Phyllis again moved to increase her share of the military retirement to 50%, this time invoking Alaska Civil Rule 60(b) and arguing, in part, that new evidence had been discovered. Phyllis did not say what the new evidence was, though she may have been referring to a copy of the pamphlet entitled "Uniformed Services Former Spouses' Protection Act: Dividing Military Retired Pay," a publication of the Defense Finance and Accounting Service that Phyllis referenced on one of the two pages of her motion. Phyllis filed a similar motion three days later, this time including the aforementioned pamphlet. DeJeaux opposed the motion, arguing that the original determination was proper and nothing had changed since it was made. At an April 23, 2009 hearing, the superior court denied Phyllis's motion, explaining that the court's previous division of the marital portion of the retirement was correct. A written order denying the motion was issued the same day. Phyllis appeals this determination.

## B. Visitation

Camerin was five years old when the parties divorced in 2000. In the original divorce proceeding, the parties agreed that Phyllis would have sole legal and physical custody of Camerin, and DeJeaux would have "reasonable rights of visitation as the parties may amicably agree to." In July 2001, finding that the parties were incapable of informally managing DeJeaux's visitation rights in Camerin's best interests, the superior court began formally setting visitation. At the time, DeJeaux was supposed to transfer out of Alaska around October 2001. The court ordered that once DeJeaux moved, visitation would be permitted during half of summer vacations and on various alternating holidays; the court also ordered that Camerin be accompanied on all flights due to his age. In January 2002, the court ordered DeJeaux to pay two-thirds of all visitation-related travel expenses. It appears at least one visit took place before 2003.

In October 2006, DeJeaux filed a motion to enforce his visitation rights. DeJeaux alleged that Phyllis was preventing him from speaking to Camerin, refusing to return calls, and interfering with his attempts to plan visitation. DeJeaux stated that he had not seen Camerin in two years. Phyllis responded that she had not interfered in any way, and that the lack of visitation was because DeJeaux did not want to spend the time or money required.

In November 2006, the court noted that it was unclear what visitation had occurred in the previous five years, that the parties disagreed about the reasons for the lack of visitation, and that it could not "determine whether a party has been disobeying the visitation order or whether there were other reasons for the current dispute." The court ordered Phyllis to cooperate with DeJeaux in setting up the Christmas visit to which DeJeaux was entitled under the 2001 visitation order, and it set a hearing for the following January to reevaluate the situation. Because the parties could not agree on the location of the Christmas visit, the visit did not take place.

At the January 2007 hearing, DeJeaux said that although he could not afford to pay travel expenses for the spring visit to which he was entitled, he did want Camerin to visit in the summer. The court ordered that Camerin could visit DeJeaux in Texas in summer 2007, but only after DeJeaux traveled to Alaska and spent time with Camerin there. The court explained that this was necessary because "Camerin has not seen DeJeaux for so long and ... is somewhat apprehensive about traveling to see DeJeaux," and this arrangement would permit Camerin to "become more comfortable with DeJeaux."

At an April 2007 status conference, the parties acknowledged that they had not been in phone contact since the previous hearing, but they disagreed about why.[2] DeJeaux told the court that if he paid for a ticket to fly to Alaska, the expense of the flight would limit the activities he and Camerin could do together. The court questioned DeJeaux at length about his finances, then ordered that he must spend four days in Alaska, but could then spend 17 days in Texas with Camerin. It is unclear whether this visit ever took place.

In March 2008, DeJeaux filed another motion seeking an order requiring Phyllis to cooperate with his efforts to interact with Camerin. Phyllis did not respond, and the court staff found that her phone number was out of service. In July 2008, DeJeaux moved again to establish a visitation schedule, stating that he had not spoken to Camerin in a year because he did not know Phyllis's phone number. The court set a hearing, ordered Phyllis not to bring Camerin to the hearing, and said that it would "consider appointing a child custody investigator for the limited purpose of speaking to Camerin in an informal and less threatening setting to learn his preferences about visitation."

At a July 2008 hearing, DeJeaux said he wanted to bring Camerin to Texas in August, but he had only reserved a one-way ticket for his son. Phyllis objected, and the court said it would consider the visit if DeJeaux also bought a return ticket. The hearing was continued to the next day. At that hearing, DeJeaux said he could not afford the return ticket and therefore would not go through with the summer visit. The court then considered the possibility of a Christmas 2008 visit; the court ordered that flight details be arranged in advance, that DeJeaux pick up Camerin in Alaska, and that Camerin could then fly home by himself.[3] The court said to DeJeaux: "If you do not get the travel arrangements made and financed, then I'm

likely to cancel your future visitations." Phyllis asked the court to appoint a custody investigator to determine Camerin's preference, but the court did not respond to this proposal.

At a hearing in October 2008, DeJeaux said that he could not afford the Christmas visit, but that he hoped for a visit in the summer of 2009. In January 2009, Phyllis moved for an order to eliminate all visits in Texas. She seemed to argue that the long gaps in communication and Camerin's visit-related anxiety meant out-of-state visits were not in Camerin's best interest. She also argued that Camerin did not want to see DeJeaux and he was "old enough to know how he feels and why." The court denied the motion on the grounds that there were no changed circumstances that would justify modifying the visitation order.

At an April 2009 hearing, the parties began discussing the logistics for Camerin's summer 2009 visit; Phyllis said she planned to take Camerin to Japan for the summer and DeJeaux said he wanted a summer visit in Texas. The court suggested that Camerin visit DeJeaux in Texas on the way from Japan, and ordered the parties to research the cost of changing the flights to accomplish this. Around this time, Phyllis sought the court's intervention; she argued that visitation in Texas would not be in Camerin's best interests and requested appointment of a custody investigator to determine whether visitation was in Camerin's best interests. She alleged that Camerin and DeJeaux had no bond with each other and had not spoken in over a year, and that the last visit in Texas had not gone well. DeJeaux responded that he loved Camerin and wanted a relationship, but that Phyllis had interfered with his attempts to communicate with his son.

On April 23, 2009, the court denied Phyllis's requests to cancel visitation and appoint

**2.** DeJeaux said he had been calling Phyllis and produced phone records, some of them showing calls at unusual hours, and Phyllis said that she did not pick up the phone for unknown numbers, that she did not receive many of the calls, and that Camerin told her not to answer the phone if DeJeaux called. But Phyllis also at an earlier point said that her phone did not display the number of the person calling.

**3.** In a written order following the hearing, the court specified that DeJeaux had to propose dates by October and pay 60% of Camerin's travel costs, as well as 100% of his own.

a custody investigator. Phyllis appeals this order.

### C. Child Support

The parties' initial divorce decree required DeJeaux to pay $548 per month in child support. Since then, the amount of the support obligation has fluctuated in response to changes in DeJeaux's income. In June 2004, the court granted a motion of the Child Support Services Division (CSSD) to increase support to $709 per month, minus a medical insurance credit of $5.67. In June 2006, not long after DeJeaux retired, the court granted a CSSD motion to decrease support to $381. In January 2007, the court granted a CSSD motion to increase support to $556 per month [4] based in part on DeJeaux's receipt of a VA school stipend in the amount of $922 per month. The court ordered that this change be effective as of July 1, 2006.

In June 2007, however, the court expressed concern that its most recent support order was incorrect; specifically, the court questioned whether the VA school stipend should have been included in the calculations. The court asked the parties and CSSD to revisit the calculation and "file a report of their reconsideration of the proper child support." In response, CSSD revised its calculation of DeJeaux's monthly obligation to $359 per month. However, because this was less than a 15% decrease from DeJeaux's prior obligation of $381, CSSD asked the court to leave the June 2006 order intact.[5] The court agreed and in September 2007 ordered that DeJeaux's "monthly obligation of $381 will be reinstated effective 1 July 2006, the date the order of 19 January 2007 made the erroneous increase effective."

In January 2009, Phyllis moved for an increase in child support. The court ordered DeJeaux to provide updated income data. DeJeaux complied, and the court considered the new data in February 2009. Using the new data, the court determined that DeJeaux's annual income "translates to a monthly child support obligation of $587." However, the court found that "[t]he current order is for $556. That increase of $31 is less than 15% of the current obligation, therefore the potential increase is not great enough to warrant modification." On that basis, the court denied Phyllis's motion.

In February 2009, Phyllis filed a motion informing the court of an error in its earlier decision. Phyllis pointed out that the court had based its decision on the fact that the existing support order was for $556, while in fact the support order then in effect was for $381. In early March, Phyllis filed additional documents in support of her motion to increase support to $587. Later that month the court issued an order indicating that it believed Phyllis was correct about the court's error and the need for an increase, and gave DeJeaux time to respond. DeJeaux opposed the increase but did not specifically dispute that the court had used an incorrect figure in its February 4 calculation. In April 2009, the court increased DeJeaux's monthly child support obligation to $587.

A few days after the court increased DeJeaux's support obligation, Phyllis filed a new motion concerning child support. Phyllis asked the court to increase child support even beyond $587, alleging that the $587 figure did not reflect funds from DeJeaux's VA school stipend and that DeJeaux's retirement pay had increased again. Phyllis asked that any increase be made effective either November 2006, February 2008, or July 2008, dates on which Phyllis had previously submitted documents to the court concerning child support. She also asked the court to require DeJeaux to provide updated income data and for a signed release allowing the court to access DeJeaux's bank statements and other financial documents. DeJeaux opposed any increase, arguing that the previous order was correct and that he could not afford to pay any more. In April 2009, the

---

**4.** This figure did not include a medical insurance credit, as DeJeaux had not given CSSD "sufficient information to calculate said credit."

**5.** *See* Alaska R. Civ. P. 90.3(h)(1) ("A final child support award may be modified upon a showing of a material change of circumstances.... A material change of circumstances will be presumed if support as calculated under this rule is more than 15 percent greater or less than the outstanding support order.").

court denied Phyllis's motion without any explanation. Phyllis appeals this decision.

### D. Dental Expenses

In June 2004, the superior court ordered DeJeaux to provide dental insurance for Camerin. In August 2006, Phyllis incurred $232 in dental bills for Camerin arising from a routine cleaning and cavity filling. DeJeaux claimed that he had Camerin covered by insurance at that time; the court ordered DeJeaux to show proof of insurance, but DeJeaux did not comply. The parties addressed this issue at a hearing in May 2007. The court then ordered DeJeaux to show proof of insurance, and to "reimburse Phyllis for the $232 that would likely have been covered by a dental plan." At a July 2008 hearing, Phyllis alleged that DeJeaux had not yet paid her the money. DeJeaux responded that he had paid by money order but did not have a receipt or any other proof of payment. The court ordered DeJeaux to pay the $232 and show proof of payment.

In February 2009, Phyllis filed a motion for contempt, alleging that DeJeaux still had not complied with the court order to pay her the $232. DeJeaux again responded that he had paid, but still produced no proof of payment. At an April 2009 hearing, DeJeaux was evasive on the subject of proof of payment, but continued to claim he had already paid. By the hearing on April 23, 2009, DeJeaux still had not provided proof of payment.

An order on Phyllis's motion for contempt was issued on May 20, 2009, two weeks after her appeal was filed.[6]

### E. Superior Court Bias

The Williamses' case was initially assigned to Superior Court Judge John Reese, on October 12, 2000. Judge Reese retired in 2004. In May 2006, the case was ultimately reassigned to Superior Court Judge William F. Morse. Audio recordings of the hearings in this case suggest that Phyllis's exchanges with Judge Morse may have been tense. In her July 13, 2008 motion to change child support, she requested that there be no hearing and attached an explanatory letter that said, in part, "I'm scare[d] of you judge, [s]orry!" Her brief seems to accuse Judge Morse of bias in favor of DeJeaux rather than looking out for Camerin's best interests, of ignoring or overlooking crucial information that would have led to a different outcome, and of not following through on statements that he made during hearings.

### III. STANDARD OF REVIEW

We review a trial court's equitable division of marital property under the abuse of discretion standard; we will not disturb it unless the result is clearly unjust.[7] Whether the trial court applied the correct legal rule in exercising this discretion is a question of law that we review de novo.[8]

A trial court's ruling on an Alaska Civil Rule 60(b) motion is reviewed for abuse of discretion; it will not be disturbed unless we are left with "the definite and firm conviction on the whole record that the judge ha[s] made a mistake."[9]

The question of whether to deny a motion to modify visitation without a hearing is a matter of law we review de novo.[10] We generally review the trial court's decision to appoint or not appoint a custody investigator for abuse of discretion.[11]

Decisions to modify a child support award are generally reviewed for abuse of

6. *Phyllis Williams v. DeJeaux Williams* trial court docket, http://www.courtrecords.alaska.gov/pa/pa.urd/pamw2000.docket_lst?75464493 (last visited April 18, 2011).

7. *Walker v. Walker*, 151 P.3d 444, 447 (Alaska 2007).

8. *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994).

9. *Thomas v. Thomas*, 581 P.2d 678, 679 (Alaska 1978) (quoting *Gravel v. Alaskan Vill., Inc.*, 423 P.2d 273, 277 (Alaska 1967)).

10. *Morino v. Swayman*, 970 P.2d 426, 428 (Alaska 1999) (quoting *C.R.B. v. C.C.*, 959 P.2d 375, 378 (Alaska 1998)).

11. *D.D. v. L.A.H.*, 27 P.3d 757, 761 (Alaska 2001); *Pearson v. Pearson*, 5 P.3d 239, 242 (Alaska 2000).

discretion.[12] We review factual findings regarding a party's income when awarding child support for clear error.[13]

## IV. DISCUSSION

Since filing her appeal, Phyllis has filed a number of additional motions in the superior court covering custody issues similar to those that were the subjects of the April 23, 2009, written orders and hearing. In some cases, Phyllis's brief addresses the substance of these more recent motions and rulings, rather than the April 2009 decisions. Under the appellate rules, we cannot review these issues. Appellate Rule 204(b) permits an appeal from a "final order or judgment," but this final order must be specified in the notice of appeal.[14] As Phyllis's appeal was filed on May 4, 2009, and her jurisdictional statement states that she is appealing from "the April 23, 2009 final judgment," we have confined our review to the oral and written decisions issued on April 23, 2009.

### A. The Superior Court Did Not Abuse Its Discretion By Denying Phyllis's Rule 60(b) Motions.

In April 2009, Phyllis filed two motions for reconsideration of military pay under Alaska Civil Rule 60(b)—one on April 3 and a second on April 6. Judge Morse issued two written denials on April 23. He denied Phyllis's motions for lack of timeliness, as well as on the merits, writing, "The motion ... is untimely. But even if timely, the Court would deny the motion. The Court can only divide the marital portion of the retirement benefit and none of the disability benefit." The superior court did not err by denying Phyllis's motions, whether on the grounds of timeliness or on the merits.

### 1. Phyllis's 60(b) motions to reconsider allocation of DeJeaux's military retirement were untimely.

■■ In a divorce proceeding where marital property has been divided, a divorce decree incorporating a property judgment constitutes a final judgment and may be modified to the same extent as any equitable decree of the court.[15] Under AS 25.24.160(a) a court has authority to divide property, but the statute does not authorize a court to distribute assets on a "piecemeal basis" when the parties' property rights have been incorporated into a final judgment.[16] Other than a Civil Rule 77(k) motion for reconsideration, which must be made within ten days of the court's order, an Alaska Civil Rule 60(b) motion provides the only available means for seeking relief from a final judgment of property division.[17] Rule 60(b) allows relief from a final judgment or order only for specified reasons:

(1) mistake, inadvertence, surprise or excusable neglect;

(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

(6) any other reason justifying relief from the operation of the judgment.

**12.** *State, Dep't of Revenue, Child Support Enforcement Div., ex rel. Husa v. Schofield,* 993 P.2d 405, 407 (Alaska 1999). *Cf. Tillmon v. Tillmon,* 189 P.3d 1022, 1026 (Alaska 2008) ("Whether a trial court applied the correct method of calculating child support is a matter of law to which we apply our independent judgment.").

**13.** *Koller v. Reft,* 71 P.3d 800, 804 (Alaska 2003) (citing *Routh v. Andreassen,* 19 P.3d 593, 595 (Alaska 2001)).

**14.** Alaska R.App. P. 204(b).

**15.** *O'Link v. O'Link,* 632 P.2d 225, 228 (Alaska 1981) (citing *Thomas v. Thomas,* 581 P.2d 678, 679 n. 4 (Alaska 1978)).

**16.** *Lowe v. Lowe,* 817 P.2d 453, 456 (Alaska 1991).

**17.** *Id.*

It is not necessary that the ex-spouse specify which of these reasons the 60(b) motion falls under.[18]

Though Phyllis raised several different grounds for relief in her April 3 and April 6 motions, her appeal is primarily concerned with only one of these grounds. She contends that the superior court misinterpreted the USFSPA when dividing DeJeaux's military retirement pay. If true, this would fall under Rule 60(b)(1), which applies when the trial court has made a mistake of law.[19] While Rule 60(b)(1) claims must normally be filed within one year,[20] claims that the trial court has made a mistake of law constitute a special exception, and become time-barred after 30 days.[21] Though it is unclear whether Phyllis is appealing the July 2001 amended divorce decree in which the calculation was formalized, or the June 2007 order in which numbers were assigned to the calculation, she filed her 2009 motions well over 30 days after the final judgment. Her motion was therefore untimely, and the superior court did not err by dismissing the motions on that basis.

**2. The superior court did not abuse its discretion by awarding Phyllis 35% of DeJeaux's overall military retirement pay.[22]**

■ Phyllis contends on appeal that the superior court misapplied the law by awarding her "one-third" of DeJeaux's military retirement pay. DeJeaux claims that the cur-

rent calculation is correct under the law. DeJeaux is correct.

The USFSPA allows a court to divide military retirement pay between spouses if one spouse served at least ten years of active duty during the marriage, but caps the former spouse's share at 50% of the service member's disposable retired pay, that is, gross retired pay minus authorized deductions.[23] When the parties divorce prior to the service member's retirement, a formula is typically used as the basis for calculating the ex-spouse's award.[24] The current version of the pamphlet Phyllis appended to her motion provides a useful explanation of the governing law:

> A formula award is an award expressed in terms of a marital fraction, where the numerator covers the period of the parties' marriage while the member was performing creditable military service, and the denominator covers the member's total period of creditable military service. The former spouse's award is usually calculated by multiplying the marital fraction by $\frac{1}{2}$.[25]

In other words, the marital fraction represents the percentage of the retirement pay that may be considered marital property. The numerator is expressed in whole months, and is provided by court order.[26] The Department of Defense supplies the denominator "in terms of whole months of service

---

**18.** *Clauson v. Clauson*, 831 P.2d 1257, 1259–61 (Alaska 1992) (granting relief to ex-wife under 60(b)(6) though she had cited no statute for her motion to modify a final divorce decree).

**19.** *See Alaska Truck Transp., Inc. v. Berman Packing Co.*, 469 P.2d 697, 699 (Alaska 1970).

**20.** Alaska R. Civ. P. 60(b).

**21.** *Alaska Truck Transp., Inc.*, 469 P.2d at 700 (holding that Rule 60(b)(1) claims for errors of law should be subject to a 30-day time limitation).

**22.** As just explained, Phyllis's Rule 60(b) motions were untimely and could be dismissed on this basis. In light of Phyllis's pro se status, we nevertheless take this opportunity to explain how the superior court calculated the military retirement pay division.

**23.** 10 U.S.C. § 1408(a)(4), (e)(1).

**24.** Department of Defense Financial Management Regulations, Ch. 29, Vol. 7B, at 290601(E), http://comptroller.defense.gov/fmr/07b/07b—29.pdf (last visited May 18, 2011) ("If the former spouse and the member were divorced before the member became entitled to receive military retired pay, then the retired pay award may be expressed as a formula or hypothetical retired pay award in accordance with paragraphs 290607 and 290608.").

**25.** Defense Finance & Accounting Service Uniformed Services Former Spouses' Protection Act Attorney Instruction. Dividing Military Retired Pay, 6 (2010), http://www.dfas.mil/garnishment/retired military/AttorneyInstruction–01–04–10.pdf (last visited Nov. 24, 2010).

**26.** *Id.* at 7.

creditable for retirement eligibility." [27] We have upheld this calculation—one-half times the marital fraction—as fairly representing the proportion a spouse should receive. [28]

Citing to the USFSPA, Phyllis maintains that she is entitled to 50%, not 35%, of DeJeaux's military retirement pay. But she is not entitled to 50% of DeJeaux's military retirement pay—only 50% of the portion earned during the marriage. [29] The current judgment already awards Phyllis 50% of the marital fraction, using the following calculation: "50% × (months of military service during marriage) ÷ (total months of active service) more fully defined as: 50% × 168 months ÷ 240 months = 35%." Though this gives Phyllis 35% of DeJeaux's disposable retired pay overall, it is also 50% of the marital portion, and 50% of the marital assets is presumed to be an equitable division. [30]

The trial court may overcome the presumption of fairness of a 50/50 division of marital property by applying the *Merrill* [31] factors to give the divorcing spouses unequal shares. [32] Though she mentions the *Merrill* factors in passing, however, Phyllis states no facts or reasons why she is entitled under that case to more than 50% of the marital portion. Rather, her sole reason seems to be that 50% of the disposable retired pay is her statutory entitlement, which is not actually

the case. The current order is consistent with the requirements of the USFSPA and is not clearly unjust. [33] Therefore, we will not disturb the superior court order.

### B. Phyllis's Appeal Concerning The Summer 2009 Visit is Moot.

 Phyllis appeals the denial, without a hearing, of her motion to terminate the summer 2009 visit. That issue is now moot. "A claim is moot if it has lost its character as a present, live controversy," [34] and the summer of 2009 has passed. As no live controversy exists, and no exception to the mootness doctrine appears applicable to this case, we decline to reach the question of whether the denial was appropriate. [35]

### C. The Superior Court Did Not Abuse Its Discretion In Not Appointing A Custody Investigator.

██ In July 2008, in response to a motion by DeJeaux to establish a visitation schedule, the superior court issued an order which mentioned, in part, that the court would "consider appointing a child custody investigator for the limited purpose of speaking to Camerin in an informal and less threatening setting to learn his preferences about visitation." In April 2009, Phyllis moved to ap-

27. *Id.*

28. See *Doyle v. Doyle*, 815 P.2d 366, 370 (Alaska 1991) (calculating the wife's share of her ex-husband's military pension as one-half of 19/20, because husband and wife were married for 19 of the 20 years that the husband served in the army); *Chase v. Chase*, 662 P.2d 944, 945–46 (Alaska 1983) (upholding an award of one-half of 19/20 of the retiree's military retirement pay, where the divorcing husband had entered the military one year prior to the marriage and retired after 20 years of service). Notably, Phyllis cites *Chase* in support of her claim, indicating that she may have misinterpreted the ruling.

29. Retirement pay earned outside the marriage is DeJeaux's, but the money earned for time served during the marriage belongs to both DeJeaux and Phyllis.

30. *Tybus v. Holland*, 989 P.2d 1281, 1286 (Alaska 1999).

31. *Merrill v. Merrill*, 368 P.2d 546, 547–48 n. 4 (Alaska 1962). AS 25.24.160(a)(4) codifies and expands on these factors.

32. See, e.g., *Tybus*, 989 P.2d at 1286.

33. *McCoy v. McCoy*, 926 P.2d 460, 463 (Alaska 1996) ("The superior court's distribution will not be disturbed unless it is so clearly unjust as to constitute an abuse of discretion.").

34. See *Akpik v. State, Office of Mgmt. & Budget*, 115 P.3d 532, 535 (Alaska 2005) (quoting *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1195 (Alaska 1995)).

35. After Phyllis filed this appeal in May 2009, she filed new motions in September 2009 and February 2010 seeking to end future visits. But Phyllis's appeal is limited to decisions made by the superior court in April 2009. The September 2009 and February 2010 post-appeal motions and accompanying decisions are not properly before this court, as they were filed well after Phyllis's appeal. We therefore decline to reach the merits of these motions.

point a custody investigator for the purpose of determining Camerin's visitation preferences. The superior court denied Phyllis' motion on April 23, 2009. Phyllis challenges this decision of the superior court.

 A trial court has wide discretion to decide when a child custody investigation is appropriate.[36] The purpose of these investigations is to assist trial judges in determining a child's best interests.[37] To that end, "[u]nless it can be shown that a court would be unable to determine the child's best interest without a custody investigation, a trial court does not abuse its discretion when it decides not to appoint an investigator."[38]

Though Phyllis's argument regarding the custody investigator is unclear, she appears to have two main contentions. First, she claims that an investigator should be appointed because Judge Morse said he would consider it. This argument fails because there is no requirement in the law that a judge appoint a custody investigator simply because he said he would consider it.

Second, she cites to *Brooks v. Brooks*,[39] in which we stated that trial courts facing "hearsay-based allegations [of domestic violence] have the option to order a child custody investigator to interview the child or children and to consider the investigator's report in deciding whether to hold a hearing on the basis of those allegations."[40] But *Brooks* does not support Phyllis's claims. The portion she quotes supports rather than defeats the discretionary standard granted to the trial court, giving the trial court the "option" of appointing a custody investigator rather than making it mandatory.[41]

Phyllis offers no evidence to support the notion that the superior court cannot determine Camerin's best interests without a child custody investigator. Because Phyllis has not made a showing that Judge Morse abused his discretion, she has failed to show any error.

### D. The Superior Court Did Not Err In Its Handling Of Matters Concerning Child Support.

#### 1. Calculation

 Modifications of child support are generally governed by AS 25.24.170, Civil Rule 90.3, and this court's precedent.[42] When a party moves to increase a child support obligation, the burden lies upon the moving party to show by a preponderance of the evidence that there has been a "material and substantial change in income."[43] Absent this showing, a court may reject a motion to modify without a hearing.[44] A material change of circumstances is presumed where the support calculated is 15% greater or less than the existing support order.[45] In considering the proposed modification of child support, the court evaluates the child's needs, the parents' needs, and the parents' financial capabilities.[46]

Phyllis claims on appeal that the amount of child support currently ordered is incorrect, and that the tax returns used in the calculation reflect neither DeJeaux's military benefits nor his disability benefits. But her evidence falls short of meeting her burden of proof. Her evidence consists of allegations that DeJeaux has more assets than reported in his income tax returns, but she produces no facts or written documentation showing this. Nor does she produce any calculation

36. *D.D. v. L.A.H.*, 27 P.3d 757, 761 (Alaska 2001) (citing *Pearson v. Pearson*, 5 P.3d 239, 242 (Alaska 2000)).

37. *Id.*

38. *Id.*

39. Mem. Op. & J. No. S–13544, 2010 WL 143494 (Alaska, Jan. 13, 2010).

40. *Id.* at *3.

41. *Id.*

42. *See, e.g., Tillmon v. Tillmon*, 189 P.3d 1022, 1027–28 (Alaska 2008).

43. *Routh v. Andreassen*, 19 P.3d 593, 596 (Alaska 2001) (citing *Dewey v. Dewey*, 886 P.2d 623, 629 (Alaska 1994)).

44. *Acevedo v. Burley*, 944 P.2d 473, 475–76 (Alaska 1997).

45. *Ward v. Urling*, 167 P.3d 48, 52 (Alaska 2007).

46. *Dewey*, 886 P.2d at 629 (citing *Curley v. Curley*, 588 P.2d 289, 292 (Alaska 1979)).

showing that DeJeaux has had a change in circumstances that would increase her entitlement by at least 15%. In support of Phyllis's claim, she cites an Iowa case holding that veterans' disability benefits are income even though they are tax-exempt. Yet that is not in dispute: The superior court's order includes veterans' disability benefits in the child support calculation.

■ Though this court has acknowledged the validity of concerns that income tax returns might not be reflective of true income,[47] "a court cannot presume a party is obstructive per se when the party provides a substantial response to requests for evidence."[48] The trial court is only required to arrive at a "'reasonable assessment' of the obligor's earning capacity"; though there must be "sufficient evidence from which the court can make informed calculations,"[49] perfect evidence is not required. In this case, the superior court had a variety of documents from which to calculate child support, including, as it noted, DeJeaux's "2007 tax return, a document showing his retirement pay effective 2 January 2009, and a letter showing that he will be getting a reduction in his disability pay in November 2009." From this the superior court could reasonably calculate DeJeaux's earning capacity. Phyllis has not shown that the court clearly erred in

its valuation of DeJeaux's child support payments.

## 2. Alleged cancellation of past-due child support payments

■ Phyllis claims that DeJeaux was nearly $4,000 behind in child support payments when Judge Reese retired and that Judge Morse improperly cancelled DeJeaux's arrears. Phyllis appears to feel that she has a second claim of arrears as well, for a different time period: A copy of a CSSD audit of DeJeaux's child support payments is included in Phyllis's excerpt of record, and she has drawn an arrow to a balance of $3,493 in October 2007, then another arrow to a zero balance in July 2008, following an "adjustment" of $2,878.74 that occurred in October 2007. In her brief she refers to it as "where in fact Mr. Williams' arrears were zero[ed] out."[50]

As a procedural matter, a party seeking to collect past-due child support payments must first reduce the arrears to a judgment in the trial court, under AS 25.27.226.[51] Once this has occurred, the custodian may begin proceedings to enforce that judgment. The Child Support Enforcement Division can also initiate the process of obtaining a judgment for arrears, and the original divorce decree

---

47. *Routh,* 19 P.3d at 596 (citing *Ogard v. Ogard,* 808 P.2d 815, 819 (Alaska 1991)).

48. *Id.*

49. *Ward,* 167 P.3d at 54.

50. As discussed in Part II.C, *supra,* there is evidence in the record suggesting that DeJeaux overpaid his child support amount in 2006 and 2007, paying $556 per month when he should have paid $381 per month. In a September 2007 order, the superior court corrected the error, then suggested that DeJeaux was "entitled to a credit towards his future child support" to the extent that he had overpaid, though it noted that it did not know how CSSD handled these credits. CSSD made the $2,878.74 adjustment one month later. Though Phyllis claims that this is an instance where DeJeaux's arrears were cancelled, it appears that the alleged cancellation is in fact an adjustment that CSSD made to account for DeJeaux's overpayment of child support.

51. AS 25.27.226 outlines the procedure for collecting past-due payments. The statute provides:

To collect the payment past due, the custodian of a child, or the [Child Support Services] agency on behalf of that person, shall file with the court (1) a motion requesting establishment of a judgment; (2) an affidavit that states that one or more payments of support are 30 or more days past due and that specifies the amounts past due and the dates they became past due; and (3) notice of the obligor's right to respond. Service on the obligor must be in the manner provided in AS 25.27.265. The child's custodian, or the agency on behalf of the custodian, shall file with the court proof of service of the petition, affidavit, and notice. The obligor shall respond no later than 15 days after service by filing an affidavit with the court. If the obligor's affidavit states that the obligor has paid any of the amounts claimed to be delinquent, describes in detail the method of payment or offers any other defense to the petition, then the obligor is entitled to a hearing. After the hearing, if any, the court shall enter a judgment for the amount of money owed. If the obligor does not file an affidavit under this section, the court shall enter a default judgment against the obligor.

between Phyllis and DeJeaux actually states that "[a]ny issue as to Mr. Williams' arrears since the October 10, 2000 effective date of the interim Child Support Order can be dealt with by the Child Support Enforcement Division."

Nothing in the record indicates that the superior court ever entered a judgment for the alleged arrears, nor that Phyllis attempted to obtain such a judgment and was denied. As there is no judgment in the superior court to appeal, the issue of arrears is not properly before this court.

### E. Phyllis Did Not Show That Judge Morse Was Personally Biased Against Her.

 To prove a claim of judicial bias, the claimant must show that the judge formed an opinion of her from extrajudicial sources, resulting in an opinion other than on the merits.[52] Phyllis has not made this showing. Merely making decisions that a plaintiff considers unfavorable is not bias, and though Phyllis accuses Judge Morse of not looking out for Camerin's best interests, Judge Morse's rulings are supported by the record. Forming an opinion from available evidence does not constitute personal bias.[53]

In addition, while Phyllis quotes Judge Morse and impliedly accuses him of not following through on assertions he made at the hearings, she relies on the summary of proceedings rather than the actual hearing tapes. The summary is not a transcript; it is intentionally truncated. For instance, citing the July 31, 2008 hearing, she quotes Judge Morse as saying to DeJeaux, "sir if no travel arrangements made and financed I will cancel future visitation," which is how his words appear in the Summary of Proceedings. Judge Morse's actual words were, "If

you do not get the travel arrangements made and financed, then I'm likely to cancel your future visitations." His actual statements are not as Phyllis claims, and provide no grounds for concluding that Judge Morse behaved improperly, or made promises to her that he did not keep.

### F. Other Claims

 The issue of unpaid dental expenses recurs in Phyllis's brief, appearing in her Table of Contents, her Statement of the Case, and in her Argument section (although not in her Statement of Points on Appeal). Her essential claim is that DeJeaux owes her $232 in unpaid dental expenses; the superior court has not disputed this, though she has been unable to collect the money. In February 2009, she filed a motion for contempt against DeJeaux. According to the trial docket, the superior court issued an order on this motion on May 20, 2009, two weeks after Phyllis filed the present appeal.[54] The ruling is outside the scope of Phyllis's appeal, and so we decline to reach the issue of dental expenses.[55]

It is possible that Phyllis has raised other issues in her brief. To the extent that she has, we have not discussed them because we are unable to discern an argument, or because the statement was made too briefly or in the absence of meaningful context. We have held that even for pro se litigants, "[w]here a point is given only cursory statement in the argument portion of a brief, the point will not be considered on appeal."[56] Arguments not appearing above have been waived.

## V. CONCLUSION

Because Phyllis's two 60(b) motions were untimely and lacked merit, we AFFIRM the

**52.** *Peterson v. Ek,* 93 P.3d 458, 467 n. 20 (Alaska 2004) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).

**53.** *Id.*

**54.** *Phyllis Williams v. DeJeaux Williams* trial court docket, http://www.courtrecords.alaska.gov/pa/pa.urd/pamw2000.docket_lst?75464493 (last visited April 18, 2011).

**55.** To the degree that Phyllis has a valid claim, she may be able to obtain assistance from Child Support Services pursuant to AS 25.27.107–.225. In part, these provisions provide litigants a means of requesting an audit for overdue child support payments, reducing this amount to a judgment, and having the amount collected.

**56.** *A.H. v. W.P.,* 896 P.2d 240, 243 (Alaska 1995) (citing *Adamson v. Univ. of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991)).

superior court's order denying the motions to reconsider the military pay division. Because the motion concerning 2009 visitation is moot, we DISMISS Phyllis's appeal of the superior court's order denying reconsideration of visitation. Because the superior court correctly calculated child support and did not cancel past-due support amounts, we AFFIRM the court's orders regarding child support. We AFFIRM the superior court's denial of Phyllis's motion for appointment of a child custody investigator because the superior court did not err in deciding not to appoint a custody investigator. Finally, we determine that Phyllis's claim that Judge Morse was improperly biased against her lacks merit.