NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KEVIN A. KHAN, | ) | |
| | ) | Supreme Court No. S-16483 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-06517 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| CATHY A. COULTER, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1671 – March 28, 2018 |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Kevin A. Khan, pro se, Scottsdale, Arizona, Appellant. J. E. Wiederholt, Aglietti, Offret & Woofter, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I.     INTRODUCTION

Following a custody trial the superior court awarded sole legal and primary physical custody to the mother, finding that the father had a history of perpetrating domestic violence. The father appeals. We affirm.

## II.     FACTS AND PROCEEDINGS

Kevin A. Khan and Cathy A. Coulter married in 1990 in Denmark. Three children were born to the marriage: two daughters, L.R. and A.C., who are now adults,

---

\*     Entered under Alaska Appellate Rule 214.

and a son, J.C., who was 14 years old at the time of the custody trial.[1]  The parties separated in September 2012, and Cathy filed for divorce in April 2013.  Trial on the issue of custody of J.C. was held on September 6 and 7, 2016.  Trial on the issue of property distribution was moved to a later date and is not a part of this appeal.

At trial Cathy testified about domestic violence perpetrated by Kevin during the marriage.  The first incident of domestic violence she described occurred in Phoenix, Arizona in either 1998 or 1999.  She explained that the family "had moved back and forth between Alaska and Phoenix a couple of times" and that she and Kevin agreed they would stay in Phoenix if she received a fellowship for doctoral studies.  After she received the fellowship, she told Kevin that she planned to stay in Phoenix and get her doctorate.  She testified that Kevin "just went into a rage and he started kicking [her] and pushing [her] toward the door," that he threw a chair across the room that hit another chair and broke the wall, and that he pushed her out the door and shut it.  Cathy testified that her two daughters and a friend's daughter were able to get out of the house to get to her but that she and A.C. were not wearing shoes and their feet were burning in the 110-degree heat.  She testified that Kevin threw a gallon water jug at them and that it hit A.C. and broke open.  She asked for her keys so she could leave, but Kevin refused.  She then ran across the street with the children to a neighbor's house and called the police.  The police got her keys and purse for her and arrested Kevin.

Cathy testified to a second incident of domestic violence, which Kevin perpetrated against L.R.  L.R. was 19 years old and wanted to move out of the house, but Kevin did not want her to move out.  Much of Cathy's testimony was hearsay and was not admitted, but Cathy stated that she observed the fight from downstairs, saw Kevin

---

[1]     We use initials to protect the children's privacy.

throwing L.R.'s clothes over the railing of the balcony, and heard Kevin screaming and L.R. crying.

Cathy was asked whether there had been other specific incidents of domestic violence. She initially replied that she could not name a particular incident but that Kevin had "this ongoing constant tirade of rages and criticism and even when he[] [was] in a good mood, the jokes [were] derogatory." She testified that he would often go into fits of rage and break things; that he broke L.R.'s curling iron and cell phone; and that there were broken doors around the house, although she did not testify to seeing the doors actually being broken. She then described a time when Kevin was driving A.C., who was 16 or 17 years old at the time. According to Cathy, Kevin was mocking A.C., and A.C. pulled his hair. He then drove back to the house, got out of the car, and punched A.C. in the head. Cathy testified that Kevin aimed for A.C.'s face but A.C. moved her head and Kevin hit A.C. in the side of the head.

Janet Coulter, Cathy's mother, testified about the second incident of domestic violence that Cathy had mentioned. She stated that it occurred in June 2011 at the family's house in Anchorage. Janet and her husband had recently purchased a house in Anchorage, and they were living with Cathy, Kevin, and the children while the house was in escrow. L.R. was going to start college and was hoping to move in with a friend, but Kevin did not want her to move out. Janet testified that L.R. was in her bedroom; Kevin went up the stairs and started screaming at her and she talked back to him. Kevin "threw a bunch of [L.R.'s] clothes over the balcony or steps or whatever you want to call it. And then he just started . . . kicking at her and pushing her and she fell down several stairs."

Janet testified that she was on the first floor of the house and that the argument happened on the second floor. She explained that she did not see the argument at first but that she was at the bottom of the stairs and saw Kevin kicking and pushing

L.R. down the stairs and saw her fall down the stairs. L.R. ran to the garage, and Janet went with her. Janet testified that L.R. had bruises developing and that she wished she had taken a picture. Janet stated that she tried to call the police but had no service on her cell phone and that L.R. begged her not to call the police.

Kevin testified and disputed Cathy's and Janet's testimony. He introduced many different letters and text messages into evidence that he said showed loving and normal family relations. He testified that he was not abusive and that he never hit Cathy or any of his children. Regarding the incident in Phoenix, Kevin explained that Cathy wanted to get her doctorate but that the family's finances were not in a good place. He said that he and Cathy had serious discussions about this but then one day she just told him that she decided she would do it. Kevin testified that he then accused her of wanting to leave him. The confrontation escalated, and Cathy and the three children tried to run away from the house. Kevin explained that Cathy ran out the door because she was afraid of him because he had yelled at her that she should leave him now. He denied hitting Cathy. When asked where Cathy's bruises came from, Kevin suggested that she might have hit herself on the door while leaving.

With respect to the June 2011 incident with L.R., Kevin testified that L.R. was on medication and was not acting normally, so he was worried about her living on her own. He said Cathy said that it was normal for a child to want to move out of the family home at 18. Kevin testified that one day he found used furniture that Janet bought for L.R. in the garage and he was upset. He asked L.R. why she bought furniture, told her that he was worried about her, and that children in his culture stay with the parents until they have a stable life. L.R. told him she wanted to move out. Kevin testified that he then raised his voice only so that Janet could hear him so that she would know L.R. was his daughter. He then told L.R. to get out. Kevin testified that he did not hit L.R., kick her, throw her down the stairs, or throw her clothes over the balcony.

L.R. testified by telephone. With respect to the June 2011 incident, L.R. stated that she and her father disagreed about whether she should move out. She said that she and her father got in a fight and that he threw some of her stuff, mostly clothes, down the stairs. They both yelled at each other. She walked down the stairs, and he followed. He kicked some of her stuff but never kicked her, and there were no bruises. She testified that there was no physical contact between her and Kevin throughout the incident.

On cross-examination L.R. was read a Facebook Messenger exchange between Cathy and L.R. that had been sent around the time of the June incident. In it L.R. told Cathy that Kevin kicked her and pushed her down the stairs. L.R. testified that she said that because she wanted attention from her mother and that it was not true. She testified that Kevin did throw clothing over the balcony. She asserted that she could not remember whether she fell down the stairs.

On cross-examination Kevin was confronted with the difference between his testimony that he did not throw clothing over the balcony and L.R.'s testimony that he did. Kevin responded that he could not remember whether he did or not.

The superior court found by a preponderance of the evidence that Kevin had perpetrated three incidents of domestic violence — the incident in Phoenix in 1998, the incident with L.R. in 2011, and the incident when he punched A.C. in the head after driving.[2] The court found Cathy's and Janet's testimony credible and Kevin's and L.R.'s testimony not credible.

---

[2]     The court acknowledged that Cathy testified that there were more domestic violence incidents and that Kevin created a coercive, controlling environment, but it found that testimony about these other incidents of domestic violence lacked the specificity required to make a finding that a domestic violence incident had occurred.

Based on the three incidents of domestic violence, the court concluded that the presumption against custody by "a parent who has a history of perpetrating domestic violence" applied.[3] The court awarded sole legal and primary physical custody of J.C. to Cathy. The court did not award Kevin visitation, finding that he "must complete at least 20 weeks of a 36 week Domestic Violence Intervention Program[4] and complete parenting classes before any further steps toward reunification may occur. [Kevin] must then secure a therapist in Anchorage, Alaska to engage with [J.C.'s therapist] and [J.C.] in therapy together."[5]

Kevin appeals.

## III. DISCUSSION

### A. Substantive Issues

Alaska Statute 25.24.150(g) establishes a rebuttable presumption against awarding custody to "a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner." A parent has a history of domestic violence if "the parent has engaged in more than one incident of domestic

---

[3] AS 25.24.150(g) ("There is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child.").

[4] The superior court orally found that Kevin would need to complete at least 24 weeks of a 36-week domestic violence intervention program, but its written findings required only 20 weeks. Neither party addresses this discrepancy.

[5] J.C.'s therapist also testified at trial. He testified that J.C. was "of an age and capacity to state his preference, that that preference [was] meaningful and well founded, and [that] his preference [was] that he have nothing more to do with []his father." Based largely on this testimony, the superior court found, in the alternative, that awarding Cathy sole legal and primary physical custody was in J.C.'s best interests.

violence."[6]  Kevin argues that the superior court erred in finding that the domestic violence presumption applied in this case.

" 'Whether the court's findings on domestic violence are supported by the record is a question of fact which we review for clear error.' 'But whether the court used the proper legal standard for applying the domestic violence presumption — including whether the court's findings support applying the presumption — is a question of law, which we review de novo.' "[7]

Kevin argues that Cathy lied in her testimony about the first domestic violence incident in Phoenix. He points out that he was never charged with a crime. He notes that Cathy sent him a letter about six weeks later where she said that she loved him and missed him. Finally, he argues that this incident occurred four years before J.C. was born and therefore did not affect him.

It is the role of the trial court to evaluate witness credibility, and "we ordinarily will not overturn a trial court's finding based on conflicting evidence . . . and . . . will not re-weigh evidence when the record provides clear support for the trial court's ruling."[8] The superior court found that Cathy was credible as to this incident, and this finding was not clearly erroneous. And it was for the trial court to decide what weight, if any, to give to Cathy's letter. Moreover AS 25.24.150(g)-(h) does not require that a perpetrator of domestic violence be charged with a crime of domestic violence before the trial court may find that domestic violence occurred. Finally, the statute does not require

---

**6**      AS 25.24.150(h).

**7**      *Faye H. v. James B.*, 348 P.3d 876, 878 (Alaska 2015) (quoting *Yelena R. v. George R.*, 326 P.3d 989, 998 (Alaska 2014)).

**8**      *In re Adoption of Hannah L.*, 390 P.3d 1153, 1156 (Alaska 2017) (quoting *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009)).

the domestic violence to have an effect on the child. Domestic violence against the other parent is expressly considered.[9]

With respect to the second domestic violence incident, Kevin argues that Cathy and Janet lied. He questions why Janet did not call the police or take pictures of L.R.'s bruises. He argues that the alleged victim's testimony discredits Cathy's and Janet's testimony. Finally, Kevin argues that Cathy's testimony and Janet's testimony were inconsistent. He construes Cathy's testimony that her "mother and father were staying downstairs in the basement" and that her mother "came up" to mean that Janet was in the basement when the incident started; Janet testified she was on the first floor. This, Kevin argues, means that Cathy and Janet could not both be credible.

Again, the superior court made credibility determinations that are supported by the evidence. It did not clearly err in crediting Janet's testimony over L.R.'s and Kevin's, especially considering L.R.'s and Kevin's testimony that they did not remember certain critical facts, L.R.'s and Kevin's conflicting testimony about Kevin throwing clothing, and the contemporaneous Facebook messages. Finally, it is not clear that Cathy's testimony and Janet's testimony were inconsistent. Even if they were, the inconsistency was slight and not particularly relevant. The superior court did not clearly err in crediting Janet's and Cathy's testimony.[10]

---

[9]     AS 25.24.150(g). Kevin also purports to quote from the police report of the incident. The police report was not introduced into evidence, so the superior court did not clearly err in not considering it.

[10]     Kevin argues for the first time in his appeal that J.C. was spending the night at a friend's house and was not at home during the incident. Whether J.C. was present is irrelevant under AS 25.24.150(g)-(h), which does not require any adverse impact on the child for the presumption against custody to apply. But both Cathy and Janet testified that J.C. was crying during the incident. If evidence had been introduced in the superior court that J.C. was not present, this could have impugned Cathy's and Janet's credibility.
(continued...)

With respect to the third domestic violence incident, Kevin argues that Cathy lied and questions why she did not take pictures of A.C.'s bruises. This again is a credibility argument, and the superior court did not clearly err in crediting Cathy's testimony.

Kevin finally argues that Cathy presented no evidence other than testimony that any of these events occurred. But the trial court may rely solely on sworn testimony "without requiring additional documentation."[11]

The superior court did not clearly err in finding that three incidents of domestic violence occurred. And it did not legally err in concluding that the presumption against custody applied.[12]

## B.    Procedural Issues

After direct examination of Cathy, Kevin's counsel requested that cross-examination be done on the second day of the trial so that he could prepare for cross-examination with Kevin. The superior court denied the request. Kevin appears to argue that the court should have granted this request and that the failure to do so violated Kevin's right to due process. "The trial judge is vested with wide discretion in controlling the order of proof, examination of witnesses, and the scope of

---

[10]    (...continued)
But no evidence was presented to the court. The court therefore did not clearly err on this issue.

[11]    *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 399 P.3d 646, 656 (Alaska 2017).

[12]    Because we affirm the court's determination that the presumption against custody for parents with a history of perpetrating domestic violence applied, we need not review its best interests determination. We note that the court appropriately weighed all the best interests factors under AS 25.24.150(c) and found them to favor awarding custody to Cathy.

cross-examination."[13] Kevin has not demonstrated that the court abused its discretion in denying his request.[14] Kevin did not make a due process argument in superior court and cites no authority in his briefing to this court to support his due process argument. The due process argument is therefore waived.[15] Other arguments that Kevin may be attempting to make regarding the superior court's decisions not to accept Kevin and Cathy's earlier settlement agreement and to place a lien on the marital home, as well as any other potential arguments about the right to a fair hearing and the right to parent, are similarly waived for inadequate briefing.

In his reply brief Kevin challenges the superior court's pre-trial decision not to appoint a child custody investigator. Because Kevin did not make this argument in his opening brief, the argument is waived.[16] It is also meritless. "A trial court has wide discretion to decide when a child custody investigation is appropriate," and it does not abuse its discretion "[u]nless it can be shown that a court would be unable to

---

[13]     *Pedersen v. State*, 420 P.2d 327, 337-38 (Alaska 1966).

[14]     Kevin argues that he was not on notice before trial that Cathy would make allegations of domestic violence. But pre-trial memoranda, affidavits, and briefs routinely discussed domestic violence. Kevin's argument is without merit.

[15]     *See Wright v. Anding*, 390 P.3d 1162, 1169 (Alaska 2017) ("Even a pro se litigant . . . must cite authority and provide a legal theory." (omission in original) (quoting *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1063 (Alaska 2005))).

[16]     *See In re Ivy*, 350 P.3d 758, 765 n.32 (Alaska 2015).

determine the child's best interest without a custody investigation."[17] There was ample testimony to support the court's findings in this case.[18]

## IV.    CONCLUSION

We AFFIRM the superior court's custody order.

---

[17]    *Williams v. Williams*, 252 P.3d 998, 1008 (Alaska 2011) (alteration in original) (quoting *D.D. v. L.A.H.*, 27 P.3d 757, 761 (Alaska 2001)).

[18]    Kevin also argues that Cathy's lawyer in superior court (who is not representing Cathy on appeal) "attacked [his] race and heritage." In a memorandum in opposition to Kevin's motion for interim custody, Cathy's trial lawyer wrote:

> While it may well be the male-dominated[,] chauvinistic, misogynistic[] society from which Mr. Khan was produced . . . finds this type of behavior to be perfectly acceptable, Mr. Khan is not residing in the Middle East. Mr. Khan is residing in America and would do well to remind himself that it is American standards that will apply in this case. Mr. Khan was abusive to not only his son but . . . to his wife. His attempt to rely on a settlement agreement which was coerced and the product of years of abuse only underscores his lack of understanding of American values.

We agree with Kevin that this kind of language and the sentiment behind it are unworthy of a lawyer who is an officer of the court. Comments about a party's national origin, unless national origin is an issue in a case, risk impugning the integrity of the American judicial process. However, Kevin makes no specific allegations of prejudice on the part of the superior court judge, and we see nothing in the record that calls into question the superior court's decision. To his credit, Cathy's lawyer at oral argument before this court disavowed her trial lawyer's imprudent language.