*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| RODNEY S. PEDERSON, | ) |
| | ) Supreme Court No. S-16386 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-14-05525 CI |
| v. | ) |
| | ) O P I N I O N |
| ARCTIC SLOPE REGIONAL | ) |
| CORPORATION, | ) No. 7236 – April 13, 2018 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Paul E. Olson, Judge.

Appearances: Rodney S. Pederson, pro se, Anchorage, Appellant. James E. Torgerson, Stoel Rives LLP, Anchorage, and C. Robert Boldt, Kirkland & Ellis LLP, Los Angeles, California, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

WINFREE, Justice.

## I.    INTRODUCTION

A corporate shareholder sought a shareholder list to mail proxy solicitations for an annual director election. The corporation required a signed confidentiality agreement in exchange for releasing the list. After obtaining and using the list, the shareholder later declared the agreement unenforceable, refused to return or destroy the

list, and invited the corporation to file suit. The corporation obliged, seeking to establish that the shareholder had breached the confidentiality agreement and that the corporation was not obligated to provide the shareholder access to its confidential information for two years.

After the superior court refused to continue trial or issue written rulings on the shareholder's two pending summary judgment motions — which the court effectively denied at the start of trial — the shareholder declined to participate in the trial. The court proceeded with trial, ruled in favor of the corporation, and denied the shareholder's subsequent disqualification motion. The shareholder appeals.

Because the superior court did not err in determining the shareholder had materially breached a valid, enforceable contract and did not err or abuse its discretion in its pretrial decisions or in denying the post-trial disqualification motion, we affirm those aspects of the decision. But because the declaratory relief granted by the superior court regarding the shareholder's statutory right to seek corporate information no longer pertains to a live controversy, we vacate it as moot without considering its merits.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Rodney Pederson is an Arctic Slope Regional Corporation (ASRC) shareholder. Pederson, an attorney, has had disputes with ASRC about both (1) corporate books and records access requests and (2) materials he has sent ASRC shareholders in proxy solicitations and other mailings. We decided one such dispute regarding Pederson's requests to review certain corporate books and records in *Pederson v. Arctic Slope Regional Corp.*[1]

---

[1]    331 P.3d 384 (Alaska 2014).

In late April 2013 Pederson requested an ASRC shareholder list for soliciting proxies in that year's annual directors election. He agreed to "complete and sign ASRC's standard shareholder address list request." A week later Pederson submitted the standard request form, stating that his purpose was "[t]o distribute a proxy solicitation to selected ASRC shareholders for the 2013 ASRC annual meeting & election of [d]irectors." The form included the following provisions:

> I understand that I may, at my own expense, use the services of a third-party mailing house designated by ASRC who will have access to the shareholder list. I acknowledge that the information contained in the list is ASRC proprietary and confidential information, and may not be (i) disclosed or disseminated by me to any other party or (ii) reproduced (in physical or electronic format) or used in any manner by me except for the above stated purpose.

The form also included the following clause: "I understand that any unauthorized or improper use of the shareholder records, including this list, will, among other things, be cause for the Corporation to deny future records requests I may make . . . ."

ASRC also required Pederson to sign a separate confidentiality agreement, which he did in May, approximately one month before the 2013 annual election. That agreement included the following provisions:

> [I]n consideration of the Recitals and receipt of Confidential Information and the covenants and conditions herein contained, the parties agree as follows:
>
> . . . Pederson agrees that the Confidential Information shall be used solely for the purposes described in the Inspection Requests. . . .
>
> Consistent with the stated purpose in the Inspection Requests, if Pederson chooses to copy any Confidential Information in whole or in part, Pederson agrees to return all written or electronic copies of the Confidential Information on or before June 24, 2013, together with a statement signed

under penalty of perjury that Pederson has returned all copies of the Confidential Information.

The agreement was limited in scope to information not otherwise part of the public domain or available to Pederson on a non-confidential basis, and it included the following clause: "Pederson understands that the Company may use any breach of this Agreement by Pederson as a basis to deny any future inspection requests."

Pederson created a spreadsheet from the shareholder list and sent the information to a commercial printing company that mailed his proxy solicitation to approximately 6,000 ASRC shareholders. Pederson did not return the shareholder list by the deadline contained in the confidentiality agreement. In July an ASRC officer sent Pederson an email requesting he return any copies of the shareholder list in his possession and comply with all other terms of the confidentiality agreement. Pederson did not respond.

In October, after submitting another request to inspect and copy ASRC's shareholder list, Pederson sent ASRC's counsel an email asserting that he had spent about 100 hours inputting the hard copy of the earlier shareholder list into his spreadsheet and stating:

> [T]he electronic version ASRC forced me to produce on my own [is] my work product, and not the "property" of ASRC. I am reasonable though, and may be willing to negotiate a reasonable rate for the work to convert the list, if they want my work product as opposed to what they provided me.

In another email sent the same day Pederson asserted he had never been "provided a legible copy of the 'agreement' . . . so I could not comply with 'terms' that I was not aware of. Further, it was made clear . . . that I would not be allowed to inspect the list unless I first signed the 'agreement' in the exact form that ASRC demanded." He continued, "ASRC was well aware that annual meeting time constraints made it

impossible for me to object to the highly unreasonable terms . . . or to file a court action to compel production." Pederson asserted for the first time that many addresses were unreadable or intentionally misprinted to sabotage his mailing, and he threatened suit.

In November Pederson sent ASRC's counsel another email, stating:

> [I]f your client thinks they are in such a great position regarding the "agreement" they forced me to sign to get the addresses to distribute my proxies, then why don't they just sue me? Lets [sic] have a judge decide if the agreement is enforceable under the circumstances under which my signature was obtained.

In spring 2014 Pederson used the information to distribute a proxy solicitation to ASRC shareholders for the 2014 annual director election. Pederson returned a paper copy of the shareholder list to ASRC in 2015, but never returned any electronic information he had created.

## B. Proceedings

ASRC brought suit in March 2014, primarily seeking: (1) a determination that Pederson had breached the confidentiality agreement; (2) injunctive relief for the return of its confidential information; and (3) declaratory judgment that ASRC was not obligated to provide Pederson access to its confidential information for two years. The superior court issued a routine pretrial order in May, setting the deadline for dispositive motions in late June 2015, a trial call in early September 2015, and trial in the middle of that month.

Pederson filed a summary judgment motion in February 2015. He argued that there was "no actual controversy or harm" for the court to decide, and that ASRC had no affirmative right to seek declaratory judgment. ASRC filed an opposition the following month, pointing to what it contended were a number of factual disputes barring summary judgment. In June, Pederson was elected as an ASRC director. Late in

August, a week before the trial call and well beyond the June dispositive motion deadline, Pederson filed a second summary judgment motion. He argued that "Pederson's [recent] election to the Board of Directors of the Plaintiff ASRC and his return of the 'confidential' shareholder list to ASRC render[ed] this action moot." This argument referenced Pederson's recent return of the paper copy of the ASRC shareholder list; Pederson also stated that he had destroyed all electronic and disc copies of the shareholder information.

Pederson attended the early September trial call telephonically; ASRC's counsel attended in person. ASRC requested "discovery specifically on and limited to the representations made in support of Mr. Pederson's new [summary judgment] motion. We can then . . . decide how to respond . . . ." The court later restated this request to ensure Pederson understood it: "[ASRC's counsel] is saying he wants an opportunity to do some discovery to find out whether all these things are true . . . . And I'm not speaking for him, but it sounds like the only way there's some possibility this might resolve is if they can verify all this information." The court confirmed Pederson had heard and understood the request, repeating "[s]o that sounds like do a deposition and get all their information, . . . they want to make sure that you have the time and ability to do this." After Pederson confirmed he had no objection, the court set a deadline for ASRC's reply and rescheduled trial for mid-November.

About two weeks later Pederson filed a motion "request[ing] that the court [deny] ASRC's request to re-open discovery [to] depose Pederson prior to opposing Pederson's Second Motion for Summary Judgment." Pederson asserted he had not agreed to re-open discovery at the trial call, he had "heard no request or a motion to reopen discovery," he "certainly was NOT asked or properly given an opportunity to oppose the request," and he "learned a long time ago not to agree to anything that ASRC requests."

At the end of September the superior court stayed Pederson's first summary judgment motion because in his second summary judgment motion he asserted the case was moot. Pederson moved for reconsideration of the stay less than two weeks later. Pederson continued refusing to be deposed, and ASRC requested a scheduling conference for the end of October. Pederson did not attend that scheduling conference, later explaining he had fallen behind in checking his mail. At the conference ASRC represented to the court that Pederson had continued to stymie its efforts to take his deposition; the court reviewed the trial-call transcript and confirmed its understanding that Pederson had agreed to the discovery. The court gave ASRC the option of moving to compel discovery or proceeding to trial as planned.

In early November ASRC requested to proceed with trial as scheduled and the court so ordered. Six days before trial Pederson requested the trial date be continued; he argued that the court should rule on his two summary judgment motions and that the parties should be granted time to consider and respond to those rulings before trial commenced.

On the first trial day Pederson again raised his continuance request, objecting to trial proceeding before the court ruled on the pending summary judgment motions. The court denied the continuance, rejecting Pederson's argument that he had not agreed to discovery at the earlier trial call. The court noted that the case had been ready for trial since September and that "there are facts in dispute and summary judgment would have been denied anyway, frankly." Pederson objected to the court's rulings, informing the court that he was "going to decline to participate in the trial," although he did not "see any reason why [ASRC's counsel] can't put on his case." Despite the court verbally instructing Pederson to remain as a party and witness, Pederson left the courtroom, and the trial continued without him.

After the first day of trial the court emailed Pederson an order giving him "an opportunity to present evidence," which Pederson allegedly did not receive until after trial had concluded. ASRC filed an affidavit on the second day of trial stating it had a courier deliver the order to Pederson's residence following the first day of trial; when no one answered, the courier posted the order on the door. Trial continued that day, and ASRC concluded the presentation of its case.

Over the next month Pederson filed a number of post-trial motions. He requested reconsideration of the continuance denial and of the order providing an opportunity to present evidence, requested that the court rule on his summary judgment motions, and sought disqualification of the superior court judge adjudicating the case. The court denied all of Pederson's post-trial motions; in the order denying Pederson's request to rule on his summary judgment motions, the court found that it had denied those motions at trial on factual grounds. The order denying disqualification was reviewed and affirmed by another superior court judge.

The court issued its findings of fact and conclusions of law in March 2016. The court ruled that the confidentiality agreement was a valid, enforceable contract and Pederson had materially breached it; that ASRC was entitled to declaratory judgments that Pederson had "offered for sale a list of shareholders" (by referring to negotations for a "reasonable rate" for his "work product" in making the spreadsheets) and "improperly used" the shareholder list (by using it for the 2014 director elections in addition to the 2013 elections) as those terms are employed in AS 10.06.430(c); and that ASRC was entitled to injunctive relief regarding the confidential information in Pederson's possession, as well as costs and attorney's fees.

Pederson appeals.

## III. STANDARD OF REVIEW

"We review procedural decisions of the superior court for an abuse of discretion."[2] "Discovery rulings are also reviewed for abuse of discretion."[3]

"Contract interpretation is a question of law subject to de novo review. When applying the de novo standard of review, we apply our 'independent judgment to questions of law, adopting the rule of law most persuasive in light of precedent, reason, and policy.' "[4] We likewise review the interpretation of statutes de novo.[5]

"A judge's decision that he is actually capable of conducting a fair trial is reviewed for abuse of discretion. The separate question whether a judge's participation in a case would lead reasonable people to question his ability to be fair is a question of law reviewed de novo."[6]

---

[2]     *Willoya v. State, Dep't of Corr.*, 53 P.3d 1115, 1119 (Alaska 2002) (citing *Dougan v. Aurora Elec., Inc.*, 50 P.3d 789, 793 (Alaska 2002)).

[3]     *Id.* (citing *Christensen v. NCH Corp.*, 956 P.2d 468, 473 (Alaska 1998)).

[4]     *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014) (footnote omitted) (first citing *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012); then quoting *Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 802 (Alaska 2011)).

[5]     *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1118 (Alaska 2009) (citing *Alaskans For Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004)).

[6]     *Heber v. Heber*, 330 P.3d 926, 934 (Alaska 2014) (footnote omitted) (first citing *Hymes v. DeRamus*, 222 P.3d 874, 880 (Alaska 2010); *Phillips v. State*, 271 P.3d 457, 459 (Alaska App. 2012); then citing *Griswold v. Homer City Council*, 310 P.3d 938, 941 (Alaska 2013); *Phillips*, 271 P.3d at 468).

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion By Re-opening Discovery After Pederson's Late-Filed Summary Judgment Motion.

Pederson argues the superior court erred by "grant[ing] the Plaintiff's oral motion to re-open discovery, long after discovery had closed." Pederson's primary argument is that he had not "heard a motion being made, much less 'agreed' to it." But the hearing transcript provides clear evidence supporting the superior court's ruling to the contrary. The court ensured Pederson could hear and understand the proceedings throughout the hearing, because Pederson participated telephonically. When ASRC requested the opportunity to conduct discovery regarding the recently filed second summary judgment motion, the court expressly repeated to Pederson that ASRC's counsel was "saying he wants an opportunity to do some discovery to find out whether all these things are true." Moments later the court again confirmed Pederson could hear and asked if ASRC's proposal worked for him. Pederson responded affirmatively.

It is unclear from Pederson's briefing what harm he alleges resulted from the decision to re-open discovery in this limited fashion. Additional discovery obviously was necessary: Pederson filed a summary judgment motion well after the deadline for dispositive motions and about two weeks before the scheduled trial date, claiming events after the close of discovery had rendered the case moot. Because that claim depended in part on Pederson's own assertions about the return or destruction of his copies of ASRC's shareholder list, in all forms, ASRC's counsel asked for "discovery specifically on and limited to the representations made in support of" Pederson's motion. The court granted that request because "it sounds like the only way there's some possibility this might resolve is if they can verify all this information." But Pederson refused to provide the required deposition, and the court accordingly denied the summary judgment motions on the ground that facts remained in dispute.

Pederson seems to argue he was prejudiced because ASRC never had to respond to his second summary judgment motion as a consequence of the discovery issue. But the motion was denied on the ground that facts remained in dispute; the requested deposition could only have helped resolve those disputed facts. The court would have been well within its discretion to strike the summary judgment motion as untimely;[7] it did not abuse its discretion by re-opening discovery and delaying the trial — with Pederson's initial agreement — when the purpose was to facilitate its ability to rule on Pederson's late-filed summary judgment motion and potentially resolve the litigation in Pederson's favor. As discussed below, Pederson's later disagreement with this decision and refusal to cooperate with discovery led directly to the denial of his summary judgment motion.

**B.      The Superior Court Did Not Abuse Its Discretion By Denying Pederson's Summary Judgment Motions At The Beginning Of Trial.**

Pederson argues it was not "proper for the court to proceed to trial without first ruling on [his] [first] Motion for Summary Judgment," which he contends would have "narrow[ed] the issues prior to trial." Related to this argument, Pederson claims the court erred by "rely[ing] upon and us[ing] the supposed 'agreement' by [Pederson] to reopen discovery as justification for denying Pederson the benefit of his factual and legal arguments presented in his two Motions for Summary Judgment." He asserts the superior court " 'disposed' of [his] motions for summary judgment by finding that he 'agreed' to reopening of discovery" and imposed "the extreme sanction of completely eliminating, wiping out his motions for summary judgment and the evidence and legal arguments provided in them from Pederson's defense." But Pederson misconstrues the function and effect of a summary judgment motion.

---

[7]      *See Prentzel v. State, Dep't of Pub. Safety*, 169 P.3d 573, 593 (Alaska 2007).

Pederson argues that "[i]t is common practice in Alaska courts for summary judgment orders to rule on numerous legal and factual issues prior to trial or to resolve cases completely. The orders routinely dispose of the legal or factual issues decided and only those remaining are specified and the trial is conducted accordingly." But courts do not decide factual issues on summary judgment; they "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted."[8] After Pederson's second summary judgment motion the superior court could not "practicabl[y] ascertain what material facts exist[ed] without substantial controversy"[9] because Pederson refused to submit to a deposition that might establish that consensus.

The court did not fail to consider Pederson's summary judgment motions, nor did it dispose of them as a sanction for the discovery issue. At the start of trial the court stated it had stayed Pederson's first motion at the September status conference "because there was no reason to go forward, to have any further discussion or argument or ruling on the first motion for summary judgment on legal issues because [Pederson's second motion for summary judgment] deemed it was moot." The court then explained: "The case has been ready for trial since September, and there are facts in dispute and summary judgment would have been denied anyway, frankly." By denying Pederson's continuance motion and proceeding to trial, any ambiguity in the ruling should have been made clear.[10] Finally, in a post-trial order denying Pederson's post-trial motion for

_____

**8** Alaska R. Civ. P. 56(d); *see also* Alaska R. Civ. P. 56(c) ("There must also be served and filed with each motion a memorandum showing that there is *no genuine issue as to any material fact . . . .*" (emphasis added)).

**9** Alaska R. Civ. P. 56(d).

**10** *See Bridges v. Banner Health*, 201 P.3d 484, 493 (Alaska 2008) (quoting
(continued...)

-12-                                                                    **7236**

decisions on his summary judgment motions, the court "f[ou]nd it [had] denied Pederson's [summary judgment] motions at trial on factual grounds."[11]

Thus it is clear that the court considered the summary judgment motions before trial, determined that genuine issues of fact were disputed, and reserved for trial the opportunity for the parties to resolve those disputes in their favor. The superior court did not abuse its discretion in handling Pederson's summary judgment motions, nor did it eliminate or otherwise deny Pederson the legal defenses contained in those motions. Pederson had the opportunity to present those defenses at trial, but he chose not to do so.

To the extent Pederson asks us to review the denials of his summary judgment motions, our case law is clear that "post-trial review of orders denying motions for summary judgment — at least when the 'motions are denied on the basis that there are genuine issues of material fact' " — is precluded.[12] In short, "the order becomes unreviewable after a trial on the merits."[13] Accordingly, the superior court's denials of Pederson's summary judgment motions on "factual grounds" are unreviewable.

---

[10]    (...continued)
*Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 274 (Alaska 2001)) ("[A] ruling on one motion is an implicit denial of another contradictory pending motion.").

[11]    *See Del Rosario v. Clare*, 378 P.3d 380, 383-84 (Alaska 2016) (noting "the court that entered the original order is in the best position to interpret its own order" and holding we review court's "interpretation of its own order for abuse of discretion").

[12]    *Larson v. Benediktsson*, 152 P.3d 1159, 1169 (Alaska 2007) (quoting *Ondrusek v. Murphy*, 120 P.3d 1053, 1056 n.2 (Alaska 2005)).

[13]    *See id.*

**C.    The Superior Court Did Not Abuse Its Discretion By Proceeding With Trial After Pederson Chose To Leave.**

Pederson argues that "[i]t was error and an abuse of discretion to proceed with trial" and allow ASRC to present its case, witnesses, and "arguments with no opportunity for [Pederson] to cross examine the witnesses or object to the presentation of evidence or arguments; basically to allow one side to present its case with no defense or opportunity for the other side to present a case."  But the superior court provided Pederson an opportunity to present his case at trial.  Pederson voluntarily, on his own initiative, and against the court's advice "decline[d] to participate in the trial."  He stated before leaving the courtroom that he did not "see any reason why [ASRC's counsel] can't put on his case."

Pederson justifies his decision not to participate on the ground that the court improperly proceeded to trial without deciding his summary judgment motions.  But, as explained above, the court did not abuse its discretion in handling Pederson's summary judgment motions.  And it is not an abuse of discretion to proceed with trial when a party voluntarily is not present.[14]  The superior court did not abuse its discretion by proceeding with trial after Pederson chose to depart.

---

[14]    We note that a court may go so far as to enter default against a non-participating party.  Alaska R. Civ. P. 55(c)(1) ("[I]f the party fails to appear for trial . . . the court may proceed ex parte upon any motion for default or default judgment."); *see also Snyder v. Am. Legion Spenard Post No. 28*, 119 P.3d 996, 1001-02 (Alaska 2005) ("Entry of default would unquestionably have been proper [where defendant did not appear for trial], for the 'fails to appear for trial' language of the rule was specifically designed to end . . . uncertainty as to a trial court's power in cases like this.").

**D.    The Superior Court Did Not Err By Determining Pederson Had Materially Breached A Valid, Enforceable Contract.**

**1.    Pederson received valuable consideration.**

After trial the superior court ruled that the confidentiality agreement was "a valid, enforceable contract."  Pederson argues on appeal that "ASRC gave nothing, in return for Pederson's signature, that he was not already entitled to receive, pursuant to [AS 10.06.430], and that ASRC was [not] already required to provide.  Absolutely nothing was given in consideration."[15]   The confidentiality agreement stated that Pederson's receipt of the requested information was consideration for his assent to the agreement's terms.  Although this consideration appears to be facially valid, Pederson argues that "as a matter of law, ASRC did not have a right to" condition his receipt of the information on his assent to the confidentiality agreement, making the agreement an invalid form of consideration.

Alaska Statute 10.06.430 entitles Pederson to the information he requested and received.  But in *Pederson v. Arctic Slope Regional Corp.* we made clear the right to that information is not absolute when we held "a corporation may unilaterally demand a reasonable confidentiality agreement because there is no indication that AS 10.06.430 prohibits such a demand."[16]  We explained:  "If the shareholder refuses to sign such a confidentiality agreement, the corporation may then refuse to release confidential information and either institute a declaratory action seeking a court order containing

---

[15]    *See* AS 10.06.430(a)-(b) (requiring a corporation to maintain "a record of its shareholders, containing the names and addresses of all shareholders and the number and class of the shares held by each" and to allow shareholders to inspect and make copies of that record).

[16]    331 P.3d 384, 402 n.54 (Alaska 2014).

reasonable confidentiality protections or await the shareholder's exercise of legal options."[17]

Regardless whether ASRC would have succeeded in such an action, it had a right to "challenge the inspectability of the information" or seek in court a "reasonable protective order[] safeguarding the use and dissemination of sensitive information to ensure that the information to which a shareholder has a right is used only for the shareholder's proper purpose . . . and does not do damage to the company."[18] Forbearing from exercising those options and delivering the requested information constitute bargained-for performance and valuable consideration.[19]

### 2.    The agreement is not unenforceable as a matter of law.

Pederson also asks us to conclude that the confidentiality agreement was improper because:  (1) the requested information was not confidential; (2) the agreement was overly restrictive; and (3) the legislative history relied upon for the *Pederson* holding authorizing a confidentiality agreement does not apply to requests for the shareholder list.

---

[17]    *Id.* at 402 (footnote omitted) (citing *Bank of Heflin v. Miles*, 318 So.2d 697, 699 (Ala. 1975)).

[18]    *Id.* at 400-01 (citing 5A WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS §§ 2220, 2255, at 286, 449 (2012); MODEL BUSINESS CORPORATIONS ACT § 16.04(d); *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 820 (Del. Ch. 2007)).

[19]    *See* RESTATEMENT (SECOND) OF CONTRACTS § 71 (AM. LAW INST. 1981) ("The performance may consist of . . . a forbearance . . . ."); *cf. id.* at § 73 ("Performance of a legal duty owed to a promisor which is *neither doubtful nor the subject of honest dispute* is not consideration; but a similar performance is consideration if it differs from what was required by the duty in a way which reflects more than a pretense of bargain." (emphasis added)).

### a. The superior court's finding that the requested information was confidential is not clearly erroneous.

The superior court found that "[m]aintaining the confidentiality of the Confidential Information is important to ASRC and its shareholders," and in support cited trial testimony to that effect by ASRC officers and employees. The court further found that Pederson had *agreed* the requested information was confidential, citing not only the confidentiality agreement itself — in which Pederson agreed the information was confidential and he would maintain its confidentiality — but also the initial request for shareholder access that Pederson voluntarily submitted. In his request form Pederson "acknowledge[d] that the information contained in the list is ASRC proprietary and confidential information." And, in direct contradiction of his argument that the information should not be considered confidential, Pederson states on appeal that he "should . . . be held to the requirements and terms of the standard Request for Shareholder Addresses form that he signed." Pederson points to no evidence contradicting the court's finding that the information was confidential.

Pederson contends the information is not confidential as a matter of law because "AS 10.06.413 provides shareholders with nearly unfettered access to the shareholder list" and "this [c]ourt made it apparent [in *Pederson*] that when another statute or regulation establishes a clear right to records or information, a corporation cannot claim that those records are confidential for purposes of demanding a confidentiality agreement prior to allowing inspection." But this is an overbroad interpretation of our holding.

In *Pederson* we stated that "[i]n particular, it would be difficult for the Corporation to argue that it has a confidentiality interest in the compensation it pays to its five most highly compensated officials in light of the mandatory disclosure

requirements of the pertinent state regulation."[20] The referenced regulation required that Alaska Native Claims Settlement Act[21] corporations include in all proxy solicitations a statement detailing executive remuneration during the preceding fiscal year.[22] That requirement has important differences from AS 10.06.413. A written statement of five employees' remuneration mailed to all shareholders in effect makes that information public. In contrast, although AS 10.06.413 requires corporations to make a shareholder list available for shareholder inspection at corporate offices for 20 days prior to shareholder meetings, the statute says nothing about giving shareholders copies of the shareholder list. Instead, shareholders seeking copies of the list must submit shareholder requests under AS 10.06.430. And in *Pederson* we made clear that under AS 10.06.430 "a corporation may request a confidentiality agreement as a prerequisite to distributing otherwise-inspectable documents."[23] When copies of the shareholder list are distributed on a by-request basis only after receipt of shareholder requests containing confidentiality clauses — which Pederson concedes are appropriate — that information does not enter the public domain like an annual statement of executive remuneration mailed to all shareholders. Pederson's argument that as a matter of law the shareholder list could not be confidential fails.

### b.    The agreement was not overly restrictive.

Pederson next argues the agreement was "overly restrictive and would have prevented [him] from making use of the list efficiently and effectively for his intended

---

[20]     331 P.3d at 403 (citing 3 Alaska Administrative Code (AAC) 08.345(b)(2)(A) (2014)).

[21]     *See* 43 U.S.C. §§ 161601-29 (2017).

[22]     3 AAC 08.345(b)(2)(A).

[23]     331 P.3d at 387.

purpose." This argument relies on our *Pederson* holding that a confidentiality agreement may be appropriate if "it (1) reasonably defines the scope of what is confidential information subject to the agreement and (2) contains confidentiality provisions that are not unreasonably restrictive in light of the shareholder's proper purpose and the corporation's legitimate confidentiality concerns."[24] This argument also fails.

Pederson's professed purpose in requesting the information was "[t]o distribute a proxy solicitation to selected ASRC shareholders for the 2013 ASRC annual meeting & election of [d]irectors." But Pederson indisputably accomplished that purpose, because the confidentiality agreement permitted him to make an electronic spreadsheet to distribute his solicitation. ASRC brought suit for breach not because of Pederson's use, but because he refused to comply with his agreement to return all copies of the information. To the extent Pederson argues that the agreement unreasonably restricted him from relying on others to help generate a spreadsheet containing the information, he also asserted to the superior court that he never accepted any offered assistance, so help apparently was not necessary for him to accomplish his purpose. And although he argues that "[t]he agreement prohibited showing the list to anyone, which was impossible given that the printer had to have access," the agreement in fact permitted him to use a specific printing company that had a confidentiality agreement with ASRC.

Pederson also argues that "[t]he agreement attempted to classify information that should not have been considered confidential to shareholders and is generally freely made available for Pederson's intended purpose," apparently in reliance on our *Pederson* holding that "it is unreasonable to designate as confidential all information subject to an inspection request without differentiating between confidential and non-confidential portions of the requested information or explaining why the

---

[24] *Id.* at 402.

corporation has good cause to believe that all of the information sought is confidential."[25] But in *Pederson* "the proffered confidentiality agreements purported to subject '[a]ll' of the information to be released to the terms of the confidentiality agreement, without any attempt to differentiate between confidential and non-confidential information."[26] The confidentiality agreement here explicitly exempted from its restrictions any information that was or became "part of the public domain other than as a result of disclosure by [Pederson] or his agents," any information Pederson could show was otherwise available to him on a non-confidential basis, and any information Pederson received from a third party on a non-confidential basis, "provided that [Pederson], after reasonable inquiry, ha[d] no reason to believe that the third party [was] otherwise prohibited from transmitting the information to [him]."[27] Contrary to Pederson's assertions, the agreement did not "attempt[] to classify information that should not have been considered confidential to shareholders and is . . . freely available."

Finally, Pederson argues that "[t]he most onerous and patently unreasonable provision was that if [he] 'violated' any of the terms, ASRC could deny any future requests." Pederson affirmatively asserts that the standard shareholder request form — which he voluntarily submitted when initially making his request — is appropriate and that he should be bound by its strictures. Yet that request form contains virtually all of the clauses he contends are unreasonable in the confidentiality agreement, including the enforcement clause: "I understand that any unauthorized or improper use of the

---

[25] *Id.*

[26] *Id.* (alteration in original).

[27] Had Pederson participated at trial perhaps he could have demonstrated that any copies he kept contained only information already available to him on a non-confidential basis. But he elected not to present a case at trial, so we cannot on that basis rule in his favor.

shareholder records, including this list, will, among other things, be cause for the Corporation to deny future records requests . . . ."

Although such relief initially was sought in the complaint, ASRC did not obtain any prospective judicial relief against Pederson based on the contract provision. ASRC obtained judgment that Pederson had materially breached the confidentiality agreement, injunctive relief requiring Pederson to return shareholder list documents, and declaratory judgment that Pederson had "offered for sale a list of shareholders" and "improperly used" the shareholder list as those terms are employed in AS 10.06.430.[28] We do not know whether ASRC will seek to enforce its putative contract remedy despite the shareholder rights established in AS 10.06.430. ASRC did not seek a declaratory judgment that, based on Pederson's breach of the confidentiality agreement, ASRC could deny any further records requests under AS 10.06.430. If Pederson makes a further AS 10.06.430 records request, ASRC will have the options set out in *Pederson*: "either institute a declaratory action seeking a court order containing reasonable confidentiality protections or await the shareholder's exercise of legal options."[29]

      **c.**     **The *Pederson* holding is not dependent on legislative history.**

Pederson argues the legislative history that "this [c]ourt relied upon in *Pederson* for authorizing the right to a confidentiality agreement in the books and records of account context" does not apply to requests for the shareholder list. Pederson refers to a *Pederson* footnote stating, in reference to reasonable confidentiality

---

[28] *See* AS 10.06.430(c) (providing "a defense to an action for penalties" brought for denying shareholder access to books and records if the person suing has in the preceding two years "offered for sale a list of shareholders" or "improperly used information secured through a prior examination of the . . . record of shareholders").

[29] *Pederson*, 331 P.3d at 402 (footnote omitted) (citing *Bank of Heflin v. Miles*, 318 So.2d 697, 699 (Ala. 1975)).

agreements, "the legislative history indicates that the legislature may have intended to give corporations just such a tool."[30] Regardless of the merits of Pederson's analysis of the legislative history's distinction between shareholder lists and books and records of account, our holding in *Pederson* was not dependent on that history. We instead concluded "that a corporation may unilaterally demand a reasonable confidentiality agreement because there is no indication that AS 10.06.430 prohibits such a demand."[31] There is no suggestion in *Pederson* that confidentiality agreements should not be available when the request is for a shareholder list.

### 3. Pederson failed to establish affirmative defenses at trial.

Throughout Pederson's appeal briefs he raises arguments pertaining to affirmative defenses against contract enforceability, such as duress, unconscionability, fraud, and impossibility, as well as to ASRC's alleged breach of the agreement. He argues, for instance: "the 'agreement' . . . was certainly not the result of fair and arms-length negotiations . . . . Pederson was forced to sign the 'agreement' because he would not have been allowed to inspect and copy the list unless he signed"; "[t]he agreement contained terms that Pederson could not reasonably comply with to accomplish his purpose"; and "[t]he list provided . . . was so darkened grey in the background . . . that Pederson's copies were nearly unreadable . . . . ASRC had an obligation under the statute to provide a list usable for Pederson's purpose and intentionally failed to do so."

ASRC responds that "the trial record contains *no evidence* to support any of these assertions" and that Pederson points to none; it contends "the court's findings and the admitted evidence directly contradict them." (Emphasis in original.) The

---

[30] *Id.* at 402 n.54 (citing Legislative Counsel, Sectional Analysis of Proposed Code Revision Bills Revising the Corporations Code, 15th Leg., 1st Sess. at 88 (May 7, 1987)).

[31] *Id.*

superior court found Pederson received and signed a legible copy of the confidentiality agreement without proposing any changes to it, received a legible copy of the requested information, used that information for his stated purpose, and, as ASRC summarizes on appeal, found "that only after receiving those benefits did [Pederson] make a *post hoc* claim that the agreement was somehow invalid." The superior court's conclusion that "[t]he [a]greement is a valid, enforceable contract" is supported by evidence presented at trial. Pederson points to no evidence supporting his allegations, and we will not entertain his fact-based claims that the agreement is unenforceable when he chose to walk out of the courtroom rather than attempt to establish those facts at trial.

### E.     Whether ASRC Is Entitled To An AS 10.06.430(c) Defense In An Action For Penalties Is Moot.

In its complaint ASRC requested declaratory judgment that under AS 10.06.430 it was "not required to provide Pederson with access to its shareholder records" as a consequence of his breach of the confidentiality agreement. But at trial ASRC sought more specific declaratory relief, that Pederson had "offered for sale" and "improperly used" the shareholder list he received as those terms are used in AS 10.06.430(c).[32] The superior court granted ASRC the requested relief, finding — and

---

[32]     The statute provides:

> An officer or agent who, or a corporation that, refuses to allow a shareholder, or the agent or attorney of the shareholder, to examine and make copies from its books and records of account, minutes, and record of shareholders, for a proper purpose, is liable to the shareholder for a penalty in the amount of 10 percent of the value of the shares owned by the shareholder or $5,000, whichever is greater, in addition to other damages or remedy given the shareholder by law. It is a defense to an action for penalties under this section that the person suing has within two years sold or offered for sale

(continued...)

entering declaratory judgment — that Pederson " 'improperly used' the Confidential Information in spring 2014 for purposes other than those he agreed to in the Agreement," and " 'offered for sale a list of shareholders' of ASRC" as those terms are used in AS 10.06.430(c).

The parties present countervailing arguments regarding the validity of the court's rulings. But these issues are moot.[33] Pederson's "offer[] for sale" email was sent in October 2013, more than two years before the court's decision was issued, at which point it could no longer provide ASRC a defense to an action for penalties under AS 10.06.430(c). The spring 2014 proxy mailing was possibly still a defense to an action for penalties when the court issued its decision, but that no longer is the case. We have no indication that Pederson has again sued ASRC for violation and penalties under AS 10.06.430(c); a Courtview search reveals no such pending litigation. Given that the court's declaratory judgment no longer can provide ASRC a defense to an action for

---

[32] (...continued)
a list of shareholders of the corporation or any other corporation or has aided or abetted a person in procuring a list of shareholders for this purpose, or has improperly used information secured through a prior examination of the books and records of account, minutes, or record of shareholders of the corporation or any other corporation, or was not acting in good faith or for a proper purpose in making the person's demand.

AS 10.06.430(c).

[33] *See Ahtna Tene Nene v. State, Dep't of Fish & Game*, 288 P.3d 452, 457 (Alaska 2012) (citing *Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 776, (Alaska 2001) ("We have previously recognized that we must be especially careful while reviewing requests for a declaratory judgment because those cases may easily become advisory opinions if the controversy is moot.")); *Cochrane v. State*, 629 P.2d 512, 512 (Alaska 1980) (Mem.) (dismissing sua sponte petition for bail review as moot).

penalties under AS 10.06.430(c), whether Pederson "offered for sale" or "improperly used" the shareholder list as contemplated by the statute is now a moot issue;[34] we therefore vacate the superior court's declaratory judgments on these points.[35]

---

[34]     *Ahtna Tene Nene*, 288 P.3d at 457 (quoting *Ulmer*, 33 P.3d at 776) ("[A] case is moot if the party bringing the action would not be entitled to any relief even if it prevails.").

[35]     We nonetheless note some concerns about the declaratory judgments.

ASRC originally sought a "[d]eclar[ation] that ASRC has no obligation to provide Pederson access to ASRC's Confidential Information for two years."  But AS 10.06.430(c) provides only "a defense to an action for penalties," not an unfettered license to refuse future proper records requests. *See also* AS 10.06.430(d) ("Nothing in this chapter impairs the power of a court, upon proof by a shareholder of a demand properly made and for a proper purpose, to compel the production for examination by the shareholder of the . . . record of shareholders of a corporation.").  And it is not readily apparent that ASRC was entitled to the defense AS 10.06.430(c) provides.

ASRC asserted that Pederson's demand for compensation in exchange for turning over the spreadsheet constituted an "offer for sale" of the shareholder list. Pederson's compensation demand may have been both unnecessarily hostile and frivolous given the clear language of the confidentiality agreement.  But we are skeptical that his behavior falls within the purview of a provision that appears intended to deter the sale of confidential information to third parties in competition with or otherwise adverse to a corporation.

Nor do we see evidence in the record that Pederson "improperly used" the confidential information.  The only "improper[] use" identified in the superior court's order was the spring 2014 proxy solicitation; that mailing was not among the purposes Pederson listed in his access request, which covered only solicitations for the 2013 election.  But a proxy solicitation is not an "improper[] use" under AS 10.06.430(c); it is the archetypal purpose of shareholder access requests. ASRC and the superior court appear to have mistakenly conflated a contract violation with a statutory violation.

**F. There Was No Error In The Denial of Pederson's Disqualification Motion.**

**1. Actual bias**

Pederson argues the superior court "exhibited bias against [him] or partiality in favor of [ASRC] or [ASRC's] counsel," citing unsubstantiated allegations of partiality and collusion. "A judicial officer must disqualify himself if he 'feels that, for any reason, a fair and impartial decision cannot be given.' "[36] We review for abuse of discretion the superior court's denial of Pederson's disqualification motion on bias grounds.[37]

Pederson cannot rely solely on the court's adverse rulings as evidence of bias; he must point to specific words or actions showing the court was partial.[38] Pederson otherwise must show the court "formed an opinion of [him] from extrajudicial sources, resulting in an opinion other than on the merits."[39] He has not made these showings.

As discussed earlier the court's rulings are supported by the record, and Pederson demonstrates no extrajudicial source of bias. Although Pederson claims "[e]very single decision and anything requiring discretion of any kind went in favor of [ASRC]," "the fact that the [superior court] frequently ruled against [Pederson] does not,

---

[36] *Heber v. Heber*, 330 P.3d 926, 933 (Alaska 2014) (quoting AS 22.20.020(a)(9)).

[37] *Id.* at 934; *see also Snider v. Snider*, 357 P.3d 1180, 1184 (Alaska 2015).

[38] *See Williams v. Williams*, 252 P.3d 998, 1010 (Alaska 2011).

[39] *Id.*

by itself, demonstrate that recusal was required."[40] Disqualification "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made," and "[m]ere evidence that a judge has exercised his judicial discretion in a particular way is not sufficient to require disqualification."[41] The baseless allegations Pederson advances do not suggest the court's interactions with Pederson were influenced by anything other than "the facts adduced [and] the events occurring at trial," and they were not "so extreme as to display clear inability to render fair judgment."[42] Pederson's bias allegations have no merit, and the superior court did not abuse its discretion in declining to disqualify itself.

### 2. Appearance of bias

Pederson also claims recusal was required because the superior court's alleged advocacy on behalf of ASRC gave rise to a reasonable appearance of impartiality. "[W]hether [the superior court]'s participation in a case would lead reasonable people to question [its] ability to be fair is a question of law reviewed de novo,"[43] and requires "a 'greater showing' . . . for recusal."[44] We conclude Pederson does not make that "greater showing" because he does not present — and the record does not reveal — evidence to substantiate this claim.

---

[40]    *Patterson v. Cox*, 323 P.3d 1118, 1123 (Alaska 2014).

[41]    *Luker v. Sykes*, 357 P.3d 1191, 1199 (Alaska 2015) (alteration in original) (quoting *Sagers v. Sackinger*, 318 P.3d 860, 867 (Alaska 2014)).

[42]    *See Hanson v. Hanson*, 36 P.3d 1181, 1184 (Alaska 2001) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)).

[43]    *Heber v. Heber*, 330 P.3d 926, 934 (Alaska 2014); *see also Snider v. Snider*, 357 P.3d 1180, 1184 (Alaska 2015).

[44]    *Patterson*, 323 P.3d at 1123 (quoting *Greenway v. Heathcott*, 294 P.3d 1056, 1063 (Alaska 2013)).

The "advocacy" Pederson cites in support of his appearance of impropriety claim includes the superior court's recounting of Pederson's agreement to participate in limited discovery at the September trial call, the court's discussion with ASRC at the October status conference scheduled to address Pederson's refusal to participate in discovery, which Pederson did not attend, and the court's advice to Pederson that as a named party and witness he needed to be present at trial. Pederson accuses "[t]he [superior] court [of having] absolutely no concern for protecting the rights of the defendant to be represented during the trial [when it advised Pederson to remain at trial due to his status as a party and witness]; only to get an additional factual basis for [its] impending ruling" in ASRC's favor.

Contrary to Pederson's characterizations, the superior court took affirmative measures to ensure Pederson — an attorney — understood the ramifications of his actions: (1) the court confirmed Pederson's assent to reopen limited discovery at the September trial call; (2) the court informed Pederson at the start of trial that as a party and witness he needed to be present; and (3) once Pederson walked out of trial, the court emailed an order giving Pederson an opportunity to present evidence at trial the following day. We conclude that the court's actions would not cause reasonable people to doubt the court's ability and willingness to be fair.[45]

## V.  CONCLUSION

The superior court's declaratory judgments regarding AS 10.06.430(c) are VACATED as moot, but its decision is AFFIRMED in all other respects.

---

[45]  *Cf. Olivit v. City & Borough of Juneau*, 171 P.3d 1137, 1147 (Alaska 2007) (noting superior court's "exemplary efforts in instructing and advising" pro se litigant on how to proceed in analysis when determining court was not biased in granting summary judgment).